[830 NE2d 1130, 797 NYS2d 802]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANDREW H. VAN BUREN, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARY B. JEANNITON, Respondent.

Argued March 22, 2005; decided May 10, 2005

## POINTS OF COUNSEL

*Richard D. Northrup, Jr., District Attorney,* Delhi *(John Hubbard* of counsel), for appellant. I. Criminal Procedure Law § 1.20 (34) (o) controls over the 1906 Water Supply Act relied on by County Court in outlining the powers of the Water Supply Police. *(Sega v State of New York,* 60 NY2d 183; *People ex rel. Thorpe v Clark,* 62 AD2d 216; *Matter of State of New York v Ford Motor Co.,* 74 NY2d 495; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York,* 41 NY2d 205.) II. The designation of Water Supply Police as police officers under Criminal Procedure Law § 1.20 (34) (o) does not violate home rule provisions of the New York State Constitution. *(Wambat Realty Corp. v State of New York,* 41 NY2d 490; *Matter of Town of Islip v Cuomo,* 64 NY2d 50; *Matter of Board of Educ. of City School Dist. of City of N.Y. v City of New York,* 41 NY2d 535; *Matter of City of Utica v Water Pollution Control Bd.,* 5 NY2d 164; *Matter of Board of Supervisors of Ontario County v Water Power & Control Commn.,* 255 NY 531.) III. Under Criminal Procedure Law § 1.20 (34) (o), the geographic area of Department of Environmental Protection Water Supply Police authority encompasses the entire watershed. *(City of New York v Village of Tannersville,* 263 AD2d 877; *City of New York v Mancini-Ciolo, Inc.,* 188 AD2d 633.) IV. As "police officers" designated by Criminal Procedure Law § 1.20 (34) (o), the Department of Environmental Protection Water Supply Police are authorized to issue simplified traffic informations throughout the watershed.

*Andrew H. Van Buren,* Hobart, respondent pro se. I. The geographical area of employment of the Department of Environmental Protection does not include Hamden, New York. *(People v Graham,* 192 Misc 2d 528, 1 AD3d 1066, 2 NY3d 762; *People v Wolf,* 166 Misc 2d 372; *People v Edmonds,* 157 Misc 2d 966; *People v Firth,* 3 NY2d 472; *People v Byron,* 17 NY2d 64.) II. Department of Environmental Protection (DEP) officers lack authority to act outside of New York City's municipal boundaries, its reservoirs, or its surrounding property, which amount to the water "sources" the DEP is charged with protecting. *(People v Woodford,* 85 Misc 2d 213; *People v Hartman,* 114 Misc 2d 138.) III. The language contained in Criminal Procedure Law § 1.20 (34) (o) limits Department of Environmental Protection

officers to law enforcement duties which accomplish the stated purpose of protecting New York City's water supply. (*People v Hartman,* 114 Misc 2d 138; *People v Lanzot,* 67 AD2d 864, 49 NY2d 796.) IV. Absent clear legislative authority, the Department of Environmental Protection lacks jurisdiction to act outside New York City's municipal boundaries.

*Terence P. O'Leary,* Walton, for Mary B. Jeanniton, respondent. I. Both the Eminent Domain Law of 1905 and the 1906 law which created and authorized the City of New York's police force defined specific geographic areas, and the areas addressed in the law of 1906 were necessarily contained within the areas taken by the 1905 Eminent Domain Law. (*City of New York v Town of Colchester,* 66 Misc 2d 83; *Matter of Long Beach Land Co.,* 182 NY 489.) II. The law of 1906 that legislatively created the City of New York's police force only authorized the performance of special duties which were expressly, clearly and unequivocally limited in scope, purpose and kind to activities involving the transient laborers at water supply construction sites within the reservoir lands. (*Nebbia v People of N.Y.,* 291 US 502; *People v Hogencamp,* 295 AD2d 808.) III. The law of 1983 that wrapped up the Legislature's 1980 strengthening of law enforcement across New York State contained a brief and piecemeal amendment which quoted words and phrases from the 1905 and 1906 laws, as codified for decades before 1983 into the Administrative Code of the City of New York, merely to clarify the police officer status of the water supply officers forgotten in 1980, and it was enacted without any indication the 1983 Legislature intended to either change the special duties of the Water Supply Police or their area of employment. IV. The "human resources" in the watershed possess, inter alia, the eyes and ears of eternal vigilance and want to go sailing in the reservoir lands pursuant to the rights secured a century ago but unreasonably curtailed by the City of New York.

*Michael A. Cardozo, Corporation Counsel,* Kingston (*Leonard Koerner, Hilary Meltzer* and *Linda A. Geary* of counsel), for City of New York, amicus curiae. I. The County Court ignored the plain language, obvious intent and legislative history of the 1983 Criminal Procedure Law amendment and therefore violated long established rules of statutory interpretation. (*New Amsterdam Cas. Co. v Stecker,* 3 NY2d 1; *Matter of Thomas v Bethlehem Steel Corp.,* 95 AD2d 118, 63 NY2d 150; *People v Collins,* 38 Misc 2d 952; *Matter of Grand Jury Subpoena Duces Tecum [Museum of Modern Art],* 253 AD2d 211.) II. The County

Court erred because it ignored several other basic principles of statutory construction which, if applied properly, would render the 1906 statute inapplicable to the New York City Department of Environmental Conservation Water Supply Police. (*Iazzetti v City of New York,* 94 NY2d 183; *Matter of Independence Party State Comm. v New York State Bd. of Elections,* 297 AD2d 459; *Davis v Supreme Lodge, Knights of Honor,* 165 NY 159; *People v Newman,* 32 NY2d 379, 414 US 1163; *Matter of New York State Cable Tel. Assn. v Public Serv. Commn. of State of N.Y.,* 87 AD2d 288; *Matter of Grand Jury Subpoena Duces Tecum [Museum of Modern Art],* 253 AD2d 211; *People ex rel. Thorpe v Clark,* 62 AD2d 216; *People v Lanzot,* 67 AD2d 864; *Pardi v Barone,* 257 AD2d 42; *Matter of American Motors Sales Corp. v Brown,* 152 AD2d 343.) III. The 1983 amendment to the Criminal Procedure Law did not violate the home rule powers of upstate local governments because the amendment addresses matters of state concern. (*Wambat Realty Corp. v State of New York,* 41 NY2d 490; *Matter of Kelley v McGee,* 57 NY2d 522; *Matter of Board of Educ. of City School Dist. of City of N.Y. v City of New York,* 41 NY2d 535; *Adler v Deegan,* 251 NY 467; *Matter of Town of Islip v Cuomo,* 64 NY2d 50; *Matter of City of Utica v Water Pollution Control Bd.,* 5 NY2d 164; *Matter of Board of Supervisors of Ontario County v Water Power & Control Commn.,* 255 NY 531; *Robertson v Zimmermann,* 268 NY 52; *Lawrence Constr. Corp. v State of New York,* 293 NY 634; *Matter of Stein,* 131 AD2d 68.)

*Eliot Spitzer, Attorney General,* Albany (*Caitlin J. Halligan, Daniel Smirlock, Peter H. Lehner, Denise A. Hartman* and *James Tierney* of counsel), for State of New York, amicus curiae. I. The Department of Environmental Protection's Water Supply Police have the authority to act as police officers under the Criminal Procedure Law within the entire New York City watershed area. II. The State of New York's designation of New York Water Supply Police as "police officers" does not violate the home rule provisions of the New York Constitution. (*Matter of Town of Islip v Cuomo,* 64 NY2d 50; *Wambat Realty Corp. v State of New York,* 41 NY2d 490; *Robertson v Zimmermann,* 268 NY 52; *Matter of Board of Supervisors of Ontario County v Water Power & Control Commn.,* 227 App Div 345, 255 NY 531.)

*Young Sommer Ward Ritzenberg Baker & Moore, LLC,* Albany (*Jeffrey S. Baker* of counsel), for Coalition of Watershed Towns, amicus curiae. I. The Coalition of Watershed Towns has an interest in having this issue resolved. II. Department of Environmental Conservation police jurisdiction should be

limited to the reservoirs and New York City-owned property. (*Matter of City of Schenectady v Flacke,* 100 AD2d 349, 63 NY2d 603.) III. Affirmance of the lower court will permit a legislative resolution of the dispute.

### OPINION OF THE COURT

GRAFFEO, J.

We are asked in this case whether the New York City Department of Environmental Protection (DEP) Water Supply Police are authorized to enforce traffic laws within the city watershed. Based on the statutes underlying their authority as police officers, we reverse the dismissal of the simplified traffic informations at issue.

### I.

By the end of the 19th century, the State Legislature and the City of New York recognized the need to insure an adequate and safe supply of water for an ever-growing city population. In furtherance of this purpose, in 1905 the City was granted eminent domain powers over areas outside the City in order to create new reservoirs and build water supply facilities (*see* L 1905, ch 724). Due to the magnitude of construction contemplated and the large labor force needed to work on the project, the Legislature mandated that the New York City Board of Water Supply:

> "provide proper police protection to the inhabitants of the localities in which any work may be constructed under the authority of this act and during the period of construction, against the acts or omissions of persons employed on such works or found in the neighborhood thereof; and to that end the said board is hereby authorized and required to appoint a sufficient number of persons to adequately police the said localities for the said periods" (L 1906, ch 314, § 6).

The members of this policing force were issued certificates of appointment that were provided to the sheriffs of the counties where the officers operated (*id.*).[1]

Once the water facilities were substantially completed and the work camps closed, the need for watershed police, as

---

**1.** Using substantially the same language, the 1906 Act was codified in the New York City Code (*see* Administrative Code of City of NY § 24-355).

contemplated by the 1906 Act, subsided. Instead, the focus of their responsibilities switched to protecting the reservoirs and watershed lands from pollution, and to providing security for the new facilities. The Legislature eventually decided that permanent protection of the City's infrastructure was necessary, but that the cost of such protection would be borne by the City. In 1937, the Legislature imposed upon the Commissioner of the DEP "the duty . . . to preserve the purity of all waters from which any part of the city water supply is drawn, and to protect such supply and the lands adjacent thereto from injury or nuisance . . . [and] preserve . . . all other property connected with the water supply" (L 1937, ch 929, § 1, enacting Administrative Code § 734[1]-1.0).

Despite the fact that for many years the Legislature had recognized the authority of the City to maintain a water supply protection force (*see* L 1983, ch 969; Mem of Assembly in Support, Bill Jacket, L 1983, ch 969; Budget Report on Bills, Bill Jacket, L 1983, ch 969; Sponsor's Mem, Bill Jacket, L 1983, ch 969), the members of that force were not expressly designated "police officers" as defined in the Criminal Procedure Law. But in 1983 the Legislature conferred police officer status on DEP officers by including them in CPL 1.20 (34), the statute that lists the groups of persons that constitute police officers in New York (*see* L 1983, ch 969, § 7). This provision vested DEP police with jurisdiction over areas outside of the City in order "to protect the sources, works, and transmission of water supplied to the city of New York, and to protect persons on or in the vicinity of such water sources" (CPL former 1.20 [34] [o]). The DEP police were thus charged with "enhancing the enforcement and prosecution of violators of the laws which protect the City's water supply" (Mem of Mayor of City of NY, Bill Jacket, L 1983, ch 969).[2]

According to the City, the DEP Commissioner currently employs a departmental force of approximately 170 officers who are engaged in law enforcement activities. Over nine million people in New York City and surrounding communities rely on the New York City watershed system as their primary source of potable water. As the largest surface water supply in the United States, the City's three watershed resources—the Croton, Dela-

---

2. A subsequent amendment expanded the jurisdiction of the DEP police to encompass areas within New York City and to the protection of individuals "in the vicinity of" the City's water sources and facilities (CPL 1.20 [34] [o]; *see* L 2000, ch 599).

ware and Catskill watersheds—span an area of almost 2,000 square miles in eight upstate New York counties. The watershed includes 19 reservoirs and three controlled lakes, in addition to an extensive aqueduct system, and water control and treatment facilities.[3]

## II.

In January 2003, DEP police officers issued speeding tickets to defendants Mary Jeanniton and Andrew Van Buren, returnable in Hamden Town Court in Delaware County. Defendants separately moved to dismiss their respective uniform traffic informations on several grounds. They argued that the alleged speeding infractions occurred outside the geographical jurisdiction of the DEP police, which defendants maintained was limited to city-owned property within the watershed. Defendants also contended that DEP had failed to comply with the requirements of its 1906 enabling legislation and that enforcement of the Vehicle and Traffic Law was inconsistent with the mission of the DEP—to protect New York City's water supply. Finally, they claimed that the municipal home rule provisions of the New York Constitution prohibited such DEP law enforcement action without the consent of local government.

The Town of Hamden Justice Court dismissed both tickets and Delaware County Court affirmed. County Court reasoned that the 1906 legislation and related departmental regulations authorized DEP police functions only during the construction of water supply facilities, which concededly was not occurring at the time the tickets were issued. The court also concluded that DEP had violated the state constitutional provision regarding municipal home rule by engaging in law enforcement activities absent the consent of the Town of Hamden. A Judge of this Court granted leave to appeal and we now reverse.

## III.

As relevant here, a police officer is generally authorized to arrest an individual for a petty offense, which includes a traffic violation (*see* Vehicle and Traffic Law § 155), when: (1) there is "reasonable cause to believe that such person has committed

---

**3.** For the history of the development of the New York City water supply, see Miele, *An Enormous Amount of Work to be Done: Protecting the New York City Watershed*, 12 Fordham Envtl LJ 467 (2001) and Finnegan, *New York City's Watershed Agreement: A Lesson in Sharing Responsibility*, 14 Pace Envtl L Rev 577 (Summer 1997).

such offense in [the officer's] presence" (CPL 140.10 [1] [a]); (2) "[s]uch offense was committed or believed by [the officer] to have been committed within the geographical area of such officer's employment or within one hundred yards of such geographical area" (CPL 140.10 [2] [a]); and (3) "[s]uch arrest is made in the county which such offense was committed or believed to have been committed or in an adjoining county" (CPL 140.10 [2] [b]).

It is undisputed in this case that the DEP police officers had reasonable cause to believe that defendants violated the Vehicle and Traffic Law by speeding and that they were apprehended in the county where the alleged infractions occurred. It is also clear that the DEP officers were on patrol in their geographical jurisdiction, which encompasses all of the land within the "watershed" (Rules of City of NY Dept of Envtl Protection [15 RCNY] § 18-16 [a] [114]) as demarcated on the relevant official maps (*see* Rules of City of NY Dept of Envtl Protection [15 RCNY] Appendix A, maps 18-A.1[a], 18-A.1[b]). This watershed area includes most of the Town of Hamden (*see* map 18-A.1[b]) and defendants concede that the alleged traffic infractions occurred within the boundaries of the watershed. The DEP officers were therefore authorized as police officers under CPL 140.10 to stop defendants for speeding infractions.

Defendants' claim that DEP police should be restricted to law enforcement activities related specifically to the protection of water facilities or a direct water source (a lake or reservoir, for example) is inconsistent with the express delegation of police power to this force under the Criminal Procedure Law (*see* CPL 1.20 [34] [o]). Aside from the relevant provisions of the Criminal Procedure Law, the DEP Commissioner is statutorily empowered to protect New York City's potable water supply throughout the region of the watershed (*see* Public Health Law § 1100 *et seq.*), an authority that is similarly reflected in state regulations (*see* 10 NYCRR 128-1.1), the New York City Charter (*see* NY City Charter § 1403), the New York City Administrative Code (*see* Administrative Code of City of NY § 24-302) and the Rules of the City of New York (*see* Rules of City of NY Dept of Envtl Protection [15 RCNY] § 18-11 [a]).

Protection of that water supply cannot be accomplished by guarding lakes and reservoirs alone since watershed lands are "water sources" (CPL 1.20 [34] [o]) that the DEP police are required to protect (*see e.g.* Rules of City of NY Dept of Envtl Protection [15 RCNY] § 18-16 [a] [30]). A DEP officer who

observes a motorist traveling at high speed in excess of posted limits could be justifiably concerned that the driver poses a danger to the watershed because of the increased probability of an accident that could cause a "[p]etroleum product" (§ 18-16 [a] [78]) or other pollutants to be discharged onto watershed lands, which would seep into groundwater or flow toward a water supply site. And, aside from protecting the watershed itself, the Legislature has authorized the DEP police "to protect persons" who are within or in the vicinity of the watershed (CPL 1.20 [34] [o]). This authority includes enforcing the Vehicle and Traffic Law, violations of which necessarily create a danger to the driver of an automobile, passengers and other members of the public.

Despite the broad police powers vested in the DEP force, the DEP properly recognizes that its mission does not necessarily demand that it be in the business of setting "speed traps" merely for the sake of enforcing the Vehicle and Traffic Law—a function better left to local law enforcement agencies. The enormous expanse of the region that DEP police must patrol, the breadth of their responsibilities associated with guarding the watershed resources and transmission facilities, and the fact that they are funded by New York City, all indicate the need for administrative oversight regarding the efficient and appropriate deployment of DEP resources. As one DEP administrator has noted:

> "The primary mission of this Department is to safeguard the drinking water of the City of New York. Enforcement efforts are focused to protect the sources, works and transmissions of the New York City Water Supply System.
>
> "As law enforcement professionals, threats to the environment, threats to NYC property and threats to security of facilities, works and transmissions is our primary focus. Officers will focus on enforcement efforts directly related to our mission. The enforcement of vehicle and traffic law violations, except in extenuating circumstances, undermines our ability to meet our Department mission."[4]

Although the issuance of speeding tickets is not a core function

---

**4.** *See also* Miele, *An Enormous Amount of Work to be Done: Protecting the New York City Watershed*, 12 Fordham Envtl LJ at 485 (quoting DEP Commissioner, responding to a question about DEP police conducting traffic stops,

of the DEP force, as police officers with full authority to protect the public within the city watershed, it cannot be said that the officers in this case acted in excess of their jurisdiction.[5] We therefore conclude that the simplified traffic informations should not have been dismissed.

We also reject defendants' argument that DEP police are prohibited from patrolling the watershed by the municipal home rule provisions in the State Constitution. The right of a "local government[ ]" to administer its own affairs and enact "local legislation" affecting its "property, affairs or government" is enshrined in article IX of the State Constitution (NY Const, art IX, § 2 [b] [1], [2]). Section 3 of article IX provides, however, that "nothing in this article shall restrict or impair any power of the legislature in relation to . . . [m]atters other than the property, affairs or government of a local government" (art IX, § 3 [a] [3]). In the precarious balance between state and local powers, one definitive principle has emerged: "that a proper concern of the State may also touch upon local concerns does not mean that the State may not freely legislate with respect to such concerns" (*Wambat Realty Corp. v State of New York*, 41 NY2d 490, 494 [1977]). Hence, we have recognized that the protection of the public water supply is integral to the public health and welfare and, consequently, a matter of sufficient concern to the State to exclude it from the strictures of the municipal home rule provisions of the State Constitution (*see Matter of Town of Islip v Cuomo*, 64 NY2d 50, 57 [1984]; *Matter of City of Utica v Water Pollution Control Bd.*, 5 NY2d 164, 168 [1959]; *see also Matter of Board of Supervisors of Ontario County v Water Power & Control Commn.*, 255 NY 531 [1930], *affg* 227 App Div 345 [3d Dept 1929]). The same holds true for the vital watersheds that supply water to New York City.

Accordingly, in each case, the order of County Court should be reversed and the simplified traffic information reinstated.

Chief Judge KAYE (dissenting). I agree with the majority that

---

as stating "when they step out of the environmental end, it is because they see a danger. Now, if they see someone drunk driving . . . we are not going to ignore it. We are not going to go out of our way to go after it, but that is how our police get involved in less than environmental issues").

**5.** Nor do we agree with the courts below that the DEP police are limited to actions covered by chapter 314 of the Laws of 1906. Subsequent legislative enactments have expanded the jurisdiction of the DEP force beyond providing protection only during the construction of water facilities (*see* CPL 1.20 [34] [o]; Mem of Mayor of City of NY, Bill Jacket, L 2000, ch 599; L 1983, ch 969, § 7; L 1937, ch 929, § 1, enacting Administrative Code § 734[1]-1.0).

the geographical jurisdiction of Department of Environmental Protection (DEP) officers encompasses all of the land within the watershed (Rules of City of NY Dept of Envtl Protection [15 RCNY] § 18-16 [a] [114]) as set forth on the relevant official maps (*see* Rules of City of NY Dept of Envtl Protection [15 RCNY] Appendix A, maps 18-A.1[a], 18-A.1[b]). I cannot agree, however, that, under CPL 1.20 (34) (o), the New York City Department of Environmental Protection police had authority to hunt out speeders and issue traffic tickets. CPL 1.20 (34) (o) vests the DEP police with jurisdiction over land within the watershed only when acting "to protect the sources, works, and transmission of water supplied to the city of New York, and to protect persons on or in the vicinity of such water sources." The DEP police are trusted with "enhancing the enforcement and prosecution of violators of the laws which protect the City's water supply" (Statement of Mayor of City of NY in Support, Bill Jacket, L 1983, ch 969, at 34).

Subsection (o) is specific and discrete. It does not vest DEP officers with authority to apprehend speeders, unless such enforcement is related to protecting the watershed or the City's facilities, or an individual near a water source or facility. The People make no such showing here.

R.S. SMITH, J. (dissenting). I dissent because I accept defendants' argument, rejected by the majority in its footnote 5 (at 649), that the only statutory authorization for the police force now called the "DEP police" is contained in a 1906 enactment that became obsolete long ago.

The 1906 statute, now codified as New York City Administrative Code § 24-355, provides in relevant part:

> "It shall be the duty of the board of water supply of the city of New York, to provide proper police protection to the inhabitants of the localities in which any work may be constructed under the authority of this act [L 1905, ch 724] and *during the period of construction*, against the acts or omissions of persons employed on such works or found in the neighborhood thereof; and to that end the said board is hereby authorized and required to appoint a sufficient number of persons to adequately police the said localities *for the said periods. . . . The said board shall give to each person so appointed a certificate of appointment and certified copies thereof, one*

*of which shall be filed in the office of the sheriff of each county in which any work shall be in process of construction under this act and in which said person shall be authorized to perform his duties.* Each of said persons so appointed shall be and have all the powers of a peace officer in the county where any work is being constructed under the authority of this act . . . . The sheriff of a county wherein a certificate of appointment of any such person as a peace officer is filed may cancel such certificate for cause, and shall immediately give notice in writing of such cancellation to the board of water supply of the city of New York, specifying the cause of such revocation. . . . On such cancellation the authority of such person as a peace officer shall immediately cease." (L 1906, ch 314, § 6 [emphasis added].)

Thus the original authorization was only for the period of construction of water supply facilities, and required that certificates of appointment be filed with the sheriff of each affected county, who could cancel any certificate "for cause." It is undisputed that the construction has been complete for many decades, and that no certificates of appointment are on file.

There has never been another statutory authorization. None of the three statutes cited by the majority in its footnote 5 authorizes the employment of New York City police in the watershed area. As to two of them, no argument is or can be made that they authorize anything of the kind. Chapter 929, § 1 of the Laws of 1937 (enacting Administrative Code of City of NY § 734[1]-1.0), quoted by the majority (majority op at 645), provides that what is now the Department of Environmental Protection (DEP) shall "preserve the purity of . . . waters . . . and . . . protect [the water] supply and the lands adjacent thereto from injury or nuisance." It makes no mention of a police force. Chapter 599 of the Laws of 2000 amended Criminal Procedure Law § 1.20 (34) (o) in a way not relevant here.

Indeed, it is undisputed that, from whenever construction of the "works" referred to in the 1906 act was finished until 1983, no statutory authorization for what is now called the DEP police existed. The force created in 1906 continued to function, and I have no doubt that the people who served on it were—as the DEP police still are—performing important public duties in complete good faith. Legally, however, when they acted outside New York City they were civilians; they had no authority to act as police officers.

The People argue here that the force was effectively revived in 1983, when a section referring to "the water-supply police employed by the city of New York" was added to the definition of "police officer" in the Criminal Procedure Law. The new section, CPL 1.20 (34) (o) included within the definition:

> "A sworn officer of the water-supply police employed by the city of New York and acting outside said city, appointed to protect the sources, works, and transmission of water supplied to the city of New York, and to protect persons on or in the vicinity of such water sources."

I think it is plain from the text of the statute and its legislative history, however, that the 1983 Legislature did not think it was either creating a new police force or reviving an old one; it was only giving "police officer" status to members of a force that it believed—mistakenly—already existed.

On its face, the statute merely defines a term. It does not purport to create a police force. It specifies the category, "police officer" rather than "peace officer" or something else, to which members of a certain force shall belong—a force that, the Legislature wrongly assumed, was already in existence. The legislative history makes even clearer that the Legislature did not think it was authorizing a police force. The Assembly memorandum in support of the legislation says:

> "this bill would *clarify* that a sworn officer of the Water-Supply police employed by the City of New York and acting outside New York City [is] a police officer having been so designated in 1905 but inadvertently omitted from the peace-officer 1980 recodification provisions of the CPL" (Assembly Mem in Support of 1983 NY Assembly Bill 5782-A, Bill Jacket, L 1983, ch 969 [emphasis added]).

I think the majority—for understandable reasons—is reading the 1983 legislation as though it were sufficient to make the Legislature's mistaken assumption come true—i.e., to do what the Legislature probably would and should have done, if it had been correctly informed. I sympathize with the majority's wish to accomplish a common-sense result, and if this case involved something other than the authorization of a police force—if the public employees involved were, say, lawyers or bus drivers—I might be prepared to go along. But I am unwilling to hold that some citizens have become police, with the power to use force to

deprive other citizens of their liberty, until and unless the Legislature has unmistakably expressed an intention to confer that power on them. I would thus hold that the gap in the law that these cases have brought to light can be repaired only by new legislation.

I agree with the courts below that there was no statute permitting the officers who issued the speeding tickets in these cases to act as police officers in the watershed, and I would therefore affirm the dismissal of the simplified traffic informations.

Judges G.B. SMITH, CIPARICK and READ concur with Judge GRAFFEO; Chief Judge KAYE dissents in a separate opinion; Judge R.S. SMITH dissents and votes to affirm in another opinion in which Judge ROSENBLATT concurs.

In each case: Order reversed, etc.