[861 NYS2d 198]

Worcester Creameries Corporation et al., Respondents, v City of New York et al., Appellants.

Third Department, July 3, 2008

APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel,* New York City (*Alan Beckoff* of counsel), for appellants.

*Young, Sommer, L.L.C.,* Albany (*Kevin M. Young* of counsel), for respondents.

**OPINION OF THE COURT**

LAHTINEN, J.

This appeal presents issues regarding the extent to which defendant City of New York is obligated to pay costs incurred by owners of private watershed water treatment plants (hereinafter WWTPs) for the expense of complying with regulations that apply only in the New York City Watershed and exceed all state and federal regulations. Plaintiffs contend that, under the 1997 Watershed Memorandum of Agreement (hereinafter the Watershed MOA) and related agreements, the City and defendant New York City Department of Environmental Protection (hereinafter DEP) are obligated to pay for all regulatory upgrades for private WWTPs that were in existence in November 1995 for so long as the City's Watershed regulations exceed the requirements of state or federal law. Plaintiffs further assert that Public Health Law § 1105 provides a broad right for private property owners to recover for damages to their property in the Watershed caused by enforcement of Watershed regulations. Defendants argue that the terms of the Watershed MOA limit its financial obligation regarding private WWTPs to a maximum of 30 years and that they are not responsible for costs incurred as a result of the expansion of a private WWTP. They further urge a narrow interpretation of Public Health Law § 1105 consistent with the Second Department's decision in *Ryder v City of New York* (32 AD3d 836 [2006], *lv dismissed* 8 NY3d 896 [2007]).

The Watershed supplies drinking water to about nine million people. It encompasses approximately 2,000 square miles in parts of eight counties north of the city and includes 19 reservoirs. Ninety percent of the water comes from the Catskill/ Delaware system located west of the Hudson River, with the remaining 10% coming from the East-of-Hudson Croton system. DEP has authority, subject to Department of Health approval, to promulgate regulations to protect the water supply (*see Matter of Town of Hunter v City of New York*, 46 AD3d 1197, 1198 [2007]), and it is empowered to enforce regulations within the Watershed (*see* Public Health Law art 11; *see generally People v Van Buren*, 4 NY3d 640, 647 [2005]).

In the 1980s, federal legislation and ensuing regulations by the Environmental Protection Agency (hereinafter EPA) required that public water systems supplied by surface waters either install filtration or achieve various strict water quality controls within the Watershed. While the City elected to filter water from the East-of-Hudson portion of the Watershed, filtration would have been extremely expensive (reportedly billions of dollars to install and millions annually to operate) for the 90% of the water that comes from the West-of-Hudson section. Accordingly, the City sought approval from the EPA for a water quality protection program. To obtain approval, further Watershed regulations, which exceeded any existing state or federal regulations, were necessary. The Coalition of Watershed Towns resisted the imposition of extensive regulations due, in part, to the potential adverse economic consequences of further regulations on Watershed residents (*see generally* Finnegan, *New York City's Watershed Agreement: A Lesson in Sharing Responsibility*, 14 Pace Envtl L Rev 577 [1997] [noting the historical tension between water consumers and Watershed residents in balancing their conflicting interests]).

Extended negotiations involving, among others, the state, the City, EPA and the Coalition resulted in the implementation of the Watershed MOA in January 1997 and, as relevant here, the related Upgrade Program Agreement and Model Operation and Maintenance Agreement (hereinafter O & M Agreement). One of the issues addressed by the Watershed MOA was upgrades to all WWTPs—public and private—in order to bring them into compliance with the Watershed regulations designed to avoid a filtration requirement for the West-of-Hudson system. The City agreed to pay all costs for such upgrades (which was significantly less than installing filtration) to the extent required to comply

with the Watershed regulations and not otherwise mandated by state or federal regulations. DEP entered into the Upgrade Program Agreement with the State Environmental Facilities Corporation (hereinafter EFC) regarding, among other things, assistance from the EFC in implementing and funding the WWTP upgrade program.

Plaintiff Worcester Creameries Corporation, a long-established Delaware County milk-processing facility, owns a private WWTP which, as of November 1995, had a flow of 36,000 gallons per day. In 1998, Worcester entered into an upgrade contract with EFC to provide for upgrading its WWTP to comply with the Watershed regulations, with funding coming from the City. Thereafter, in February 2002, Worcester satisfied applicable regulatory requirements resulting in the Department of Environmental Conservation issuing a permit allowing an increase of Worcester's WWTP discharge flow to 51,000 gallons per day provided an additional infiltration pond were installed. Worcester and the City disagreed over whether, under the relevant agreements, the City's obligation to pay for upgrade costs was tied to flows allowed in November 1995 and also whether the City's obligation to pay operation and maintenance costs of a private WWTP was limited to 30 years. Although they executed an operation and maintenance agreement in September 2004, the parties reserved their rights to litigate the disputed issues within two years.

In September 2006, plaintiffs commenced this action seeking, among other things, a declaratory judgment that under the Watershed MOA (and related agreements) the City was required to pay all costs incurred to keep WWTPs in compliance with the Watershed regulations and that the obligation continued so long as costs were necessitated by Watershed regulations that imposed conditions beyond those required by state or federal regulations. Plaintiffs further asserted that Public Health Law § 1105 (1) allowed property owners to recover damages caused by the City's enforcement of its heightened regulations. Both parties eventually moved for summary judgment. Supreme Court denied defendants' motion and granted plaintiffs' motion in its entirety. Defendants appeal.

We turn first to the arguments regarding interpretation of the relevant agreements. Defendants assert that, with regard to private WWTPs, the Watershed MOA does not obligate the City to pay the capital, operational and maintenance costs for regulatory upgrades beyond 30 years, and also that the City is not

responsible for the costs associated with post-November 1995 expansions of WWTPs. "[I]t is a basic contract principle that when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (*TAG 380, LLC v ComMet 380, Inc.*, 10 NY3d 507, 512-513 [2008] [internal quotation marks, ellipsis and citations omitted]; *see W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). When interpreting a disputed contract, the document must be read "as a whole to ensure that excessive emphasis is not placed upon particular words or phrases" (*South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 277 [2005]). Where, as here, the agreement was negotiated by sophisticated and well-counseled parties, courts are "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] [internal quotation marks and citations omitted]).

A primary intent of the Watershed MOA is set forth in one of the opening paragraphs of the agreement, which states:

> "[T]he Parties recognize that the goals of drinking water protection and economic vitality within Watershed communities are not inconsistent and it is the intention of the Parties to enter into a new era of partnership to cooperate in the development and implementation of a Watershed protection program that maintains and enhances the quality of the New York City drinking water supply system and the economic vitality and social character of the Watershed communities."

With regard to regulatory upgrades, section 141 of the Watershed MOA provides, in pertinent part:

> "(a) Subject to, and in accordance with, the terms and conditions of this paragraph, the City agrees to pay for the costs of designing, permitting, constructing and installing all Regulatory Upgrades (as hereinafter defined) required by WWTPs (both public and private) in operation or permitted and under construction as of November 2, 1995 ('Existing WWTPs') . . . As used in this paragraph only, the

term 'Regulatory Upgrades' shall mean equipment and methods of operation which are required solely by the Watershed Regulations and not because of any provision of federal or [s]tate law, regulation or enforceable standard otherwise applicable to a WWTP . . .

"(b) The City further agrees to pay the annual costs of operating and maintaining such Regulatory Upgrades consistent with the terms set forth in the model agreement appended hereto as Attachment WW."

The referenced Model O & M Agreement states in section 1.02:

"B. This Agreement shall expire, unless sooner terminated pursuant to Article 10 of this Agreement, thirty (30) years after the Commencement Date. For so long as the City continues to have any obligation to pay for the O & M of a Regulatory Upgrade pursuant to subparagraphs 141 (b) and (c) of the Watershed MOA, this Agreement shall be extended every thirty (30) years for an additional period of thirty (30) years."

The term "Regulatory Upgrades" in section 141 of the Watershed MOA is surrounded by language exhibiting an intent that such term was meant to be construed expansively. The term is proceeded by the word "all" and the ensuing definition of "Regulatory Upgrades" is broadly phrased to include "equipment and methods of operation which are required solely by the Watershed Regulations and not because of any provision of federal or [s]tate law." The term "Regulatory Upgrades" is further explicitly made applicable to "both public and private" WWTPs, with no distinction between the two. The lumping together of public and private WWTPs with no limitation or distinction is telling since it is undisputed that, by the time the Watershed MOA was executed, the City had acknowledged its obligation pursuant to Public Health Law § 1104 to pay ongoing costs related to public WWTPs (including costs related to expansions).[1]

The language of the Model O & M Agreement (which was incorporated into the Watershed MOA) does not establish the

---

1. Plaintiffs acknowledge that the Watershed MOA does not apply to *private* WWTPs which were not already in operation or permitted by November 2, 1995. Given the other regulatory provisions that control expansion of WWTPs and the limiting of the City's obligation to private WWTPs to

interpretation urged by the City. The City's argument that the 30-year term contained therein was intended to reflect the useful life of replacement equipment provided during the initial upgrade is not supported by any specific language. The argument is also undercut, in part, by the fact that the same provision of the Model O & M Agreement applies to public WWTPs, for which the City acknowledges its ongoing obligation. The interpretation advanced by plaintiffs does not, as characterized by the City, create an obligation "in perpetuity." The obligation is, instead, tied to Watershed regulations for so long as those regulations exceed requirements of state or federal law.

While details of the City's ongoing responsibility regarding public WWTPs are contained in sections 142 and 143 of the Watershed MOA, the fact that such details are not separately spelled out for private WWTPs does not dispositively reveal that a more restricted obligation applies to private WWTPs. Prior to the Watershed MOA, the City had litigated the extent of its responsibilities under Public Health Law § 1104 to public WWTPs. Its position did not prevail (*see Matter of City of New York v New York State Dept. of Health*, 164 Misc 2d 247 [1995]) and sections 142 and 143 (which specifically cite to the statutory section) reflect the result of that dispute. The extent of the City's obligation to private WWTPs under Public Health Law § 1105 was still an open issue. In light of this history, the failure to include any clear language limiting its obligation to private WWTPs, while at the same time lumping them together with public WWTPs under the broad language in section 141, offsets any inference regarding intent arising from sections 142 and 143.

Under the Watershed MOA, the Watershed regulations that exceed state and federal law are linked to an ongoing obligation to both public and private WWTPs. As a benefit to the City, the Watershed regulations serve to save the City millions (and perhaps billions) of dollars since costly filtration is being avoided. And, at the same time, a quality water supply is ensured. However, the expressed intent of the Watershed MOA included not only a quality water supply system for the City, but also economic vitality for the communities in the Watershed. The interpretation urged by the City would significantly stymie the economic component of the agreement. The plain language of the agreement and the expressed intent set forth

those already existing in the mid-1990s, section 141 of the Watershed MOA is not creating an endlessly expansive obligation.

therein support Supreme Court's conclusion regarding the nature and extent of the obligations created by the Watershed MOA.[2]

■ We do, however, find persuasive defendants' argument regarding the statutory construction of Public Health Law § 1105 (1). We agree with the Second Department that the private remedy afforded by the statute applies to owners of buildings required to be removed due to the regulations and persons whose property rights are affected by such removals (*see Ryder v City of New York*, 32 AD3d 836, 838-839 [2006], *supra*; *see also Kent Acres Dev. Co., Ltd. v City of New York*, 41 AD3d 542, 550 [2007]; *Putnam County Natl. Bank v City of New York*, 37 AD3d 575, 576 [2007], *lv denied* 8 NY3d 815 [2007]). Our holding in *Virgem Enters. v City of New York* (290 AD2d 708 [2002]), which dismissed the complaint for failure to state a cause of action, does not, as argued by plaintiffs, compel a result contrary to the Second Department precedent. In *Virgem*, we did not address the issue regarding the scope of Public Health Law § 1105 (1) presented in the current case.

SPAIN, J.P., KANE, MALONE JR. and STEIN, JJ., concur.

Ordered that the order is modified, on the law, without costs, by reversing so much thereof as granted plaintiffs' motion and denied defendants' motion as to the fourth, fifth and sixth causes of action; plaintiffs' motion denied and defendants' motion granted as to said causes of action, and said causes of action dismissed; and, as so modified, affirmed.

---

**2.** Although we find insufficient ambiguities to permit consideration of extrinsic evidence of intent, we note that, had ambiguities existed, plaintiffs presented significant extrinsic evidence from other governmental parties to the negotiations supporting their position.